UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

CIVIL ACTION NO. 06-80 (WOB)

SHEILA COUCH                                                                                          PLAINTIFF

VS.                                              <u>OPINION and ORDER</u>

CONTINENTAL CASUALTY COMPANY                                        DEFENDANT


This is an ERISA case in which the plaintiff seeks a continuation of her long-term disability benefits, and a waiver of premium benefits, under the "any occupation" standard. This matter is before the court on the motion of the plaintiff for judgment on the administrative record (Doc. 14), and the cross-motion of the defendant (Doc. 26).

### FACTS

In January 1996, the plaintiff, now 56 years old, began working for Atkins & Pearce, Inc[1]. (AR-LTD-59). She worked as a machine operator performing at a medium, unskilled level. She has previously worked as an assembler in various industries, as a waitress and as a cosmetologist. In 1990, she earned her GED, and in 1992, she completed a vocational program in Cosmetology.

As part of her employment benefits, the plaintiff was a participant in a long-term disability ("LTD") benefits plan the defendant issued to Atkins & Pearce, Inc. ("the Plan").

The Plan states, in part:

**HOW DO WE DEFINE DISABILITY?**
*Disability* or *Disabled* means that You satisfy the Occupation Qualifier or the Earnings

---

[1] Atkins & Pearce is a braiding manufacturing company that makes seat belts, candle wicks, cords for mini blinds, doll hair and other products.

Qualifier as defined below.

**Occupation Qualifier**
. . .
**Class 2**
"*Disability*" means that during the *Elimination Period* and the following 36 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
1. continuously unable to perform the *Material* and *Substantial Duties* of *Your Regular Occupation*; and
2. not working for wages in any *occupation* for which *You* are or become qualified by education, training or experience.

After the *Monthly Benefit* has been payable for 36 months, "Disability" means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
1. Continuously unable to engage in any occupation for which You are or become qualified by education, training or experience; and
2. not working for wages in any *o*ccupation for which *You* are or become qualified by education, training or experience.

(AR-LTD-8).

The Plan further provides that the defendant may ask the plaintiff to submit proof that she continues to be disabled and is continuing to receive regular care. (AR-LTD-15). If such request is made, the plaintiff must submit the information sought within thirty days. *Id*.

On March 30, 2001, the plaintiff was injured at work while pulling a rack. On September 27, 2001, after being off work for the 180 day elimination period, the defendant began paying long-term disability payments under the "your regular occupation" standard.

The plaintiff began seeking treatment for her injury almost immediately. On April 6, 2001, she began treatment with Dr. Best for her injury. He obtained an MRI and x-ray films, which revealed a central disc herniation at the C3-C4 level with impingement upon the spinal cord. In addition, the MRI showed spondylosis at the C4-C5 level, a hemivertebra of C7 on the right side causing a concave scoliosis of the cervical-thoracic junction. The plaintiff also has

congenital fusion at C5-C6 and C7-T1.  Dr. Best noted that there did not appear to be any motion between the C6 and C7 levels.  (AR 405).

Dr. Best kept the plaintiff off work completely until April 27, 2001.  On April 27, 2001, he stated she could perform only sedentary work, and ordered an epidural block.  (AR-LTD-205).  Plaintiff remained off work because her job required work at the medium level.  On May 17, 2001, he again stated she could work at a sedentary level, but he also noted that the epidural block provided no relief, the plaintiff was in significant pain and he thought extensive surgery may be required.  Dr. Best also noted that the plaintiff was to see a neurosurgeon and he would continue to see her as needed.

On August 14, 2001, the plaintiff underwent a C3-C4 anterior discectomy and fusion with iliac crest graft and placement of an Atlantis anterior cervical plate.  (AR- LTD-403; AR-PW-260).  The surgery, however, provided the plaintiff with little relief from her neck and arm pain.  (AR-PW-273).  On October 12, 2001, Dr. Scott, plaintiff's neurosurgeon, referred the plaintiff to Dr. Kelly for pain management.  *Id.*

On November 2, 2001, Dr. Scott noted that the plaintiff attempted to return to work with restrictions, but was not successful due to pain in neck, shoulders, arms and hands.  (AR-LTD-415).  He stated he could not recommend sending her back to work or keeping her off on a temporary basis because he did not expect her problems to resolve any time soon.  (AR-LTD-414-15).  On December 7, 2001, Dr. Scott saw the plaintiff for the last time and stated that she continued to have neck pain with radiation into her shoulders and arms.  He noted that she had been seeing Dr. Kelly for pain management and had finished physical therapy without much improvement.  Dr. Kelly did not think there was anything else he could do for her from a surgical

standpoint, and he recommended she follow up with Dr. Kelly for pain management. (*Id.*).

Dr. Kelly treated the plaintiff with cervical epidural steroid injections, but they were not beneficial. (AR-LTD-297-302). In October 2002, the plaintiff's treatment for pain management ended with Dr. Kelly telling the plaintiff that he had done all he could for her. (AR-LTD-628).

On November 9, 2002, Dr. Kelly completed a functional assessment stating the plaintiff could not return to her full-time medium-level job. (AR-LTD-622). He further stated that the plaintiff "has completed all reasonable and appropriate medical treatment, including surgery, and has unfortunately been left with chronic neck and upper back pain which did not respond to treatment." (AR-LTD-623). Dr. Kelly also stated that the plaintiff is permanently restricted to no lifting or carrying of more than 10 pounds; no pushing or pulling of more than 15 pounds, no bending or twisting of the neck more than five times per hour, and no overhead use of the arms. (*Id.*).

In February 2002, Dr. Goldman, an orthopedic surgeon, performed an IME on the plaintiff relating to her worker's compensation claim. (AR-LTD-221-244). Dr. Goldman concluded that the plaintiff had exhibited symptom magnification during the examination. He found that she had been treated as an invalid and should be placed in a work hardening program to rebuild her strength. Dr. Goldman suggested that at the conclusion of a three-week program, the plaintiff either return to her regular work, or "more likely" have a repeat functional evaluation with work-simulation activity, to develop permanent restrictions. (AR-LTD-243).

In January 2002 the plaintiff learned that she had developed renal failure and began dialysis. (AR-LTD-173). On September 30, 2003, Dr. Cardi performed a living donor kidney transplant on the plaintiff. Dr. Cardi performed the transplant and Dr. Thomas has handled her

4

care post-transplant.

On June 30, 2003, the plaintiff was awarded Social Security benefits. (AR-LTD-198).

On December 2, 2003, a Doppler study revealed focal acute deep venous thrombophlebitis (DVT) of the bilateral soleal and peroneal veins. (AR-LTD-178).

On December 3, 2004, Dr. Cardi completed an assessment and opined that the plaintiff could not perform sedentary work due to the combined effects of kidney transplant, ruptured disc, surgery, neck fusion, chronic pain, bilateral DVT of lower extremities and her use of Coumadin. On December 13, 2004, Dr. Thomas completed a medical assessment stating that the plaintiff could perform "occupational activities that can be performed primarily while seated," but did not indicate that the plaintiff could perform on a full-time basis. (AR-LTD-540).

The defendant sought to limit Dr. Cardi's opinion to only the restrictions caused by the plaintiff's transplant. Since Dr. Thomas had been following the plaintiff post-transplant, the assessment form was forwarded by Dr. Cardi to Dr. Thomas. On December 29, 2004, Dr. Thomas completed the assessment asking whether the plaintiff could perform full-time work involving primarily sedentary activity. Doctor Thomas first checked "no" but then circled the instruction that stated to address the assessment "based only on the kidney transplant" and drew an arrow from this directive to the "yes" box. (AR-LTD-532).

In April 2005, the defendant had an assessment of employability completed on plaintiff. (AR-LTD-502-39). The evaluator stated in the assessment that she utilized the limitations provided by Dr. Kelly in November 2002, and concluded that jobs existed in the light to sedentary range that the plaintiff could perform.

In June 2005, the plaintiff experienced acute onset of numbness of the left leg while she

5

was sitting. The pain extended to the left side of the abdomen and left flank. She underwent an MRI scan of her spine and head. The MRI of the head showed no evidence of an acute infarction, but there were numerous foci of abnormal signals suggestive of small vessel ischemic disease. The MRI of the thoracic and lumbar spine showed significant degenerative disc disease and scoliotic deformity. (AR-LTD-133-42).

The plaintiff is currently taking the following medications:

Prednisone Oral Tablet 5 mg.
Calcium Carbonate-Vitamin D Oral Tablet 600-200 mg-unit
Imodium A-D Oral Tablet 2 mg.
Fish Oil Oral Capsule Conventional 1000 mg.
Pepcid Oral Tablet 20 mg.
Percocet Oral Tablet 5-325 mg.
Clonidine HCL Oral Tablet 0.1 mg.
Lopid Oral Tablet 600 mg.
Lipitor Oral Tablet 20 mg.
Coumadin Oral Tablet 5 mg
Rapamune Oral Tablet 1 mg
Lyrica Oral Capsule Conventional 50 mg.

(AR-LTD-133).

On April 25, 2005, the defendant terminated benefits under the "any occupation" definition. (AR-LTD-53, 113). The plaintiff filed an administrative appeal, which was denied. (AR-LTD-53). The plaintiff filed this appeal seeking a reversal of the defendant's decision.

## ANALYSIS

### A. ERISA

It is uncontested that this case is governed by ERISA. The parties also agree that the court must determine whether the defendant's decision to deny extended benefits was arbitrary and capricious. "The arbitrary and capricious standard is the least demanding form of judicial

review of administrative action.  When applying the arbitrary and capricious standard, the courts must decide whether the plan administrator's decision was rational in light of the plan's provisions.  Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Smith v. Continental Cas. Co.*, 450 F.3d 253, 259 (6th Cir. 2006) (*quoting Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)).  Although the arbitrary and capricious standard is highly deferential, it does not amount to "no review." *Id*.

The plaintiff argues that because the defendant was both the claims administrator and the payor, this potential conflict of interest must be considered by the court in determining whether the defendant was arbitrary and capricious.  The Sixth Circuit has held:

> We have recognized that a conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits.  *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 299 (6th Cir. 2005); *see Killian*, 152 F.3d at 521 (observing "there is an actual, readily apparent conflict, . . . not a mere potential for one" where a company both funds and administers an LTD policy, because "it incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the denial or discontinuation of benefits").  In this case, because defendant maintains such a dual role, "the potential for self-interested decision-making is evident." *Univ. Hosps. Of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n. 4 (6th Cir. 2000).  However, this conflict of interest does not displace the arbitrary and capricious standard of review; rather, it is a factor that we consider when determining whether the administrator's decision to deny benefits was arbitrary and capricious.  *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 506 (6th Cir.  2005) The reviewing court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision.  *Carr v. Reliance Standard Life Ins. Co.*, 363 F.3d 604, 606 n. 2 (6th Cir.  2004).

*Evans v. UnumProvident Corp*., 434 F.3d 866, 876 (6th Cir. 2006).  *See also Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998).

Accordingly, if the administrator's decision was rational in light of the plan's provisions and there is no evidence that the conflict influenced that decision, the decision will be upheld.

*Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 456-57 (6th Cir. 2003).

  **B. The Defendant's Decision was Arbitrary and Capricious**.

  The defendant terminated plaintiff's benefits effective March 25, 2006. In explaining the reason behind the termination the defendant stated:

> According to your physician, Dr. Thomas, on 2/03/2005 you are able to perform sedentary work. Previously, on 11/08/2002, Dr. John Kelly, pain management, provided the following permanent restrictions for your cervical condition: no overhead use of arms, no lifting or carrying over 10 pounds, no pushing or pulling over 15 pounds, and no bending or twisting of neck more than five times per hour.

(AR-LTD-80).

  Dr. Thomas's assessment of February 3, 2005, however, was specifically limited by the defendant to plaintiff's limitations as a result of her kidney transplant. In fact, a close review of this assessment indicates that Doctor Thomas did not think the plaintiff was capable of returning to full-time sedentary work based upon the effects of all of her impairments because he first checked "no" in response to the question "[i]s your patient currently able to perform full-time work that involves primarily sedentary activity with the option to stand as needed and lifting up to 10lbs. (AR-LTD-532). He then circled a portion of the instructions that stated that the doctor should answer the question "based <u>only</u> on the kidney transplant done on 3-30-03," scratched out the previously checked "no" box and drew an arrow to the checked "yes" box. Accordingly, this assessment provides some evidence that Dr. Thomas concurred with Dr. Cardi and thought that the plaintiff was precluded from full-time sedentary work as a result of the effects of all of her impairments.

  The defendant also relied upon Dr. Kelly's 2002 assessment that identified permanent restrictions for the plaintiff as supporting its finding that she could perform sedentary work on a

full-time basis. At the time the defendant requested this assessment, it was determining whether the plaintiff could perform her own medium-level occupation. The doctor confirmed that she could not: Dr. Kelly responded "no" to the defendant's specific question as to whether the plaintiff could perform full-time at a medium level and stated that he did not believe she could ever return to this level of functioning. (AR-LTD-622).

The defendant, more than three years later, refers to this assessment as evidence that the plaintiff can perform full-time at a sedentary level. A closer look at this assessment, however, illustrates that, although Doctor Kelly provided permanent restrictions that limit the plaintiff to a range of sedentary work, he did not opine that the plaintiff had the capacity to work full-time. In fact, he stated: "[the plaintiff] has completed all reasonable and appropriate medical treatment, including surgery, and has unfortunately been left with chronic neck and upper back pain which did not respond to treatment." In addition, this assessment was performed prior to plaintiff's kidney transplant, further exacerbation of her degenerative disk disease, and the onset of DVT.

In addition, the defendant's reliance in its motion on Dr. Best's statement in 2001, one to two months after injury, limiting the plaintiff to only sedentary work is also not well taken. It is clear that at the time Dr. Best restricted the plaintiff to sedentary work, he was attempting to ascertain the seriousness of her injury. A few weeks after limiting the plaintiff to sedentary work for 7-8 hours, he stated that she was in extreme pain and could not complete the physical exam due to her pain. Dr. Best also noted that the epidural block did not provide the plaintiff with any relief and he noted that surgery may be needed. (AR-LTD-200-205). On May 17, 2001, Dr. Best completed an updated restriction circling that plaintiff was limited to sitting/sedentary activity, but did not identify how long she could perform at this level. He also did not specifically

recommend that the plaintiff return to work at a sedentary level as he had previously stated. Instead, he noted that she was to see a neurosurgeon.

The record does not suggest that Dr. Best treated the plaintiff after she was referred to the neurosurgeon. Dr. Best's recommendations were based upon early evaluations of plaintiff's injury and prior to complete diagnostic imaging. As the complexity of the plaintiff's impairments became evident, Dr. Best referred the plaintiff to someone better able to serve her needs. Thus, Dr. Best's early assessments do not provide a reasoned explanation for the defendant finding that the plaintiff can perform sedentary work on a full-time basis.

The court finds that not only did the defendant mischaracterize these doctors's assessments, but it failed to consider the total effect that the combination of all of plaintiff's impairments had on her ability to function. The defendant sought to specifically limit the assessments to specific impairments. In fact, the defendant rejected Dr. Cardi's December 2004 assessment in which he opined that the plaintiff could not engage in sedentary work based upon all of her impairments and her use of Coumadin because Dr. Cardi treated the plaintiff for only her kidney transplant. (AR-LTD-546). The defendant did not, however, attempt to obtain an updated assessment from any of the plaintiff's other physicians,[2] request the plaintiff undergo a physical evaluation, or take into consideration the effect plaintiff's medication had on her ability to function. *See Smith v. Continental Cas. Co.*, 450 F.3d 253, 265 (6th Cir. 2006).

The defendant argues that Dr. Cardi's opinion was properly discounted because it

---

[2]The Plan provides that the defendant may request additional information to prove continuing disability. (AR-LTD-15). Other than seeking an assessment from Dr. Thomas, the defendant did not request any additional information from the plaintiff. The Plan also permits the defendant to have the plaintiff submit to a physical examination. (*Id*.). The defendant did not request the plaintiff undergo any additional examinations.

conflicted with that of Dr. Thomas. Dr. Thomas's assessment upon which the defendant relies, however, was completed after the defendant rejected Dr. Cardi's assessment. Further, as explained above, Dr. Thomas's assessment indicates that he agrees with Dr. Cardi that the plaintiff could not work at a full-time sedentary level based upon the effects of all of her impairments. Only after he limited his opinion to the limitations imposed on the plaintiff because of her kidney transplant did he find that the plaintiff could perform at a sedentary level.

The record reflects that the defendant did not take into consideration the total effect that all of the plaintiff's impairments had on her ability to perform full-time at a sedentary level. Accordingly, the defendant's termination of benefits was arbitrary and capricious.

Moreover, the defendant relied on an assessment of employability that was flawed. Specifically, the assessment was based upon a finding that the plaintiff could perform sedentary to light occupations. In the ability profile, the evaluator listed the plaintiff's maximum ability for strength as being at a light level. (AR-LTD-505). There is no evidence of record that the plaintiff could perform light work.

Further, despite the evaluator's statement that she considered Dr. Kelly's functional limitations, she clearly did not heed the restriction limiting plaintiff from bending and twisting

her neck to five times per hour. The evaluator recommended "stuffer,"[3] "sorter,"[4] "sales attendant[5] (with stool provided)" and "reception clerk"[6] as being occupations that the plaintiff could perform on a full-time basis. These occupations all require at least some bending and twisting of the neck as well as reaching, both of which should have been specifically evaluated but were not. (AR-LTD-509-18). The defendant must make some inquiry into whether the jobs selected are ones that the claimant can reasonably perform in light of her disabilities. *See Brooking v. Hartford Life and Accident Ins. Co.*, 167 Fed. Appx. 544, 549 (6th Cir. 2006), (*citing*

---

[3]The occupational description of "stuffer" provides: "tends machine that blows filler into stuffed-toy shells: Inserts precut supporting wire into shell. Places shell opening over stuffing machine nozzle. Depresses pedal to blow cotton or chopped foam rubber filler into shell to impart shape to toy. Places stuffed toy in tote box. Records production. May stuff toys by hand." The description further provides that this occupation requires frequent reaching and handling, and it is clear that the occupation requires bending and twisting the neck in excess of five times per hour. (AR-LTD-509-10).

[4]The occupational description for a "sorter" provides: sorts data, such as forms, correspondence, checks, receipts, bills, and sales tickets into specified sequence or grouping, . . .. (AR-LTD-515).

[5]The occupational description of the sales attendant provides "performs any combination of following duties to provide customer service in self-service store: Aids customers in locating merchandise. Answers questions from and provides information to customer about merchandise for sale. Obtains merchandise from stockroom when merchandise is not on floor. Arranges stock on shelves or racks in sales area. Directs or escorts customer to fitting or dressing rooms or to cashier. Keeps merchandise in order. Marks or tickets merchandise. Inventories stock." The occupation is listed as light requiring lifting, carrying, pushing, pulling of 20 pounds. occasionally, frequently up to 10 lbs. This position also requires frequent reaching and handling. (AR-LTD-512-13).

[6]The occupational description for a "reception clerk" provides: "Schedules appointments with employer or other employees for clients or customers by mail, phone, or in person, and records time and date of appointment in appointment book. Indicates in appointment book when appointments have been filled or cancelled. May telephone or write clients to remind them of appointments. May receive payments for services and record them in ledger. May receive callers." This position also requires frequent reaching and handling. (AR-LTD-517-18).

*Quinn v. Blue Cross & Blue Shield Ass'n*., 161 F.3d 472, 476 (7th Cir. 1998)). The defendant's reliance on the defective evaluation renders its decision arbitrary and capricious. *Id*.

Based on the evidence presented, the court finds that it was not reasonable for the defendant to conclude from the medical records that the plaintiff was able to perform a full-time sedentary occupation. Instead, the record supports a finding that plaintiff could not perform on a full-time basis at any level. Accordingly, defendant's decision to terminate benefits was arbitrary and capricious and the plaintiff is entitled to benefits.

Therefore, the court having been otherwise sufficiently advised,

**IT IS ORDERED** that plaintiff's motion for judgment on the administrative record (Doc. #15) be, and it is, hereby **granted,** and the cross-motion of the defendant (Doc. 26) be, and it is, hereby **denied**. The parties shall submit a joint final judgment to the court within **ten (10) days** of the date of this order.

This 18th day of September, 2007.



Signed By:
*William O. Bertelsman* WOB
United States District Judge